The case will be taken under advisement. Thank you to Mr. Schultz and Mr. Piper. We're now going to move to Case No. 2, Appeal No. 18-3318, United States v. Randy Williams, and we'll start first with Mr. Kasher. Good morning, Your Honors, and may it please the Court. My name is Alex Kasner, and I represent Appellant Randy Williams. Both Mr. Williams and the government agree that errors were made at both Mr. Williams's trial and at his sentencing hearing. First, the government concedes that the judge who presided over Mr. Williams's trial was disqualified from doing so under the federal judicial recusal statute because, as the Judicial Council of this Court has determined, that judge engaged in a pattern of ex parte communications with the U.S. Attorney's Office responsible for prosecuting Mr. Williams. Further, as this Court recently held in United States v. Atwood, that conceded violation of the statute is not harmless and requires remand. How much of the Atwood case should we use as the metric for decision discretion? Can you repeat the last part of that question? Sure. Should we use discretion? If discretion is key to that Atwood opinion with regard to its applicability to vacate something, how much should we employ that here? Your Honor, two responses. First of all, Atwood is helpful in this case because some of the factors, including Factor No. 2, do not rely upon discretion altogether. But even turning to discretion as the ultimate watchword of that case, discretion is key here as well because while a sentencing hearing, which is what was at issue in Atwood, involved a judge's discretion, so too does a trial. And numerous courts that have addressed this question of a 455A violation going to trial have determined that it poses the exact same risk of a judge's discretion being manifested throughout the course of the proceedings. But the trial is really different than a sentencing. A sentencing is all the judge. The judge has complete discretion to impose the sentence the court thinks is appropriate. The trial here, there was a jury that heard the evidence and made the determination of guilt or innocence. Now, in some trials leading up to the trial, there are significant rulings that may impact that, but you haven't identified any of such rulings here. A few responses, Your Honor. First, as Mr. Williams has pointed out in his reply briefings, the fact that there is a jury trial versus a bench trial does not make a difference for purposes of 455A because a judge's discretion throughout the course of trial is still going to be manifested in numerous decisions going to evidence or witnesses or objections. And so the fact that there is indeed a jury versus bench trial is not dispositive of the ultimate outcome of the case. But it is in some ways that those evidentiary rulings may be pieces along the way, but it's not the all or nothing that a sentencing is. Your Honor, the fact that a jury may have been the ultimate fact finder doesn't change the outcome because, as this court noted in the United States against Herrera-Valdez, even where there is no showing of impropriety or effect on the outcome of the proceeding, remand is still required for a new trial when you have a 455A violation. So the fact that the ultimate fact finder is different doesn't change the outcome. Part of that also goes to the fact that a judge's appearance of bias doesn't need to be manifested in particular rulings throughout the trial. After all, doing so, requiring a defendant to point to particular rulings that might have changed as a result of the appearance of bias would be effectively superimposing an actual bias requirement or an actual prejudice requirement on an appearance of bias case. But under the Lyell-Burke Act, those are relevant. The judge's rulings during trial and evidentiary rulings, et cetera, would certainly be relevant to the court's analysis of the first prong risk of injustice to the parties, wouldn't it? The fact that a judge is called upon to make evidentiary decisions is certainly important under the first act. But what the actual decisions are, wouldn't that be important? Your Honor, if a defendant could point to, for instance, a pattern of objections against him, perhaps in that case that might counsel against that. But in this case, for instance, there were certainly objections that were ruled against the defendant here, as the government has pointed out. And asking a defendant to point to particular rulings that might have been affected as a result of the appearance of bias, which in this case was against or for a litigant generally, and particular decisions called upon to be made during the course of trial. But if you don't have to identify any such objections that were ruled on that were prejudicial, aren't you asking us then just to order recusal based on an appearance? Your Honor, in this case, under 455A, this is an issue under all three factors taken together, whether there is a significant case. And so under Lillieburg Factor I, certainly is the case that a trial being a discretionary hearing would point in favor of remand. And courts have addressed this question, including the Fifth Circuit in Continental Airlines at Higginbotham and the Second Circuit in Amico, have determined that the fact that you have a trial issue points in favor of remand. But of course, this court would have to consider the other two factors as well. Yes, Your Honor? Mr. Kastner, first of all, when you came up, you said that you represent Mr. Williams. I'd like to clarify that for this record. It is an amicus, is it not? No, Your Honor. This is an appellant brief. I believe Judge Overland, that would be case four. That's an additional case. Oh, I'm sorry. If we accepted your arguments about due process and the recusal statute, would that not mean that everyone tried by Judge Bruce during the relevant time period would be entitled to a new trial? Or would it be limited to trials involving prosecutors and paralegals with whom he corresponded? Is there anything about this case in particular that distinguishes it from every other case that Judge Bruce tried? So, Your Honor, taking your questions in turn, first off, this court is inherently going to have to address this on a case-by-case basis. So Mr. Williams is not asking this court to vacate every trial that Judge Bruce presided over. As the facts of this particular case, Mr. Williams is pointing to the volume of the ex parte communications, the fact that many of them indeed went to behavior before and during trial, the personnel involved, and the timing of this case. And so on those facts and the totality, in this particular circumstance, under both due process and the judicial recusal statute, remand for new trial is required. Furthermore, if this court is looking for a particular limiting principle, we have the fact that the government has conceded a violation of 455A in this case. And so as a result, because there is an agreed upon appearance of bias here, the only question that remains under the judicial recusal statute purposes, certainly, is whether or not that was harmless. And so to return to the harmless error analysis we were discussing earlier. Don't we still have to go through the Lileberg factors? Precisely, Your Honor. Okay. And so we've discussed factor one. And if I could just follow up on your response to Judge Rovner. Let me make sure she doesn't want to follow up first. Judge Rovner, did you want to follow up on that? No. Actually, I'd be happy to have you follow up. What I want to consider after you do that is the second factor under Lileberg. Briefly on your response to Judge Rovner, she asked if our ruling here would essentially apply to all of the cases that Judge Bruce presided over, all the criminal cases. And you said, no, this is different. And two of the factors were the number of communications and the timing of the trial. Wouldn't that apply to every criminal case that was tried by Judge Bruce during the period of the communications? During the period of communications, certainly those factors would affect each of those cases. Yes, during that period. And so the question is in this particular case, given those facts and the personnel involved, the fact that many of the ex parte communications were with the paralegal involved in this case and the prosecutor involved in this case, that you have that type of nexus between the impropriety alleged and this particular case. And you agree that none of the communications pertain to this case in particular, correct? The communications disclosed ended as far as we know in May of 2018 for this case. But I'd also note that in Atwood, this court addressed a circumstance in which, again, none of the communications went to that case as well, and still order remand. So just briefly return to the other Lileberg factors. So the second factor, the risk of injustice in other cases. Atwood's analysis here was to hold that ordering remand would create an incentive in cases moving forward for parties and judges to make sure that their communications were proper. And nothing about that analysis was tied to the particulars of that case or sentencing. And so here, the exact same incentive and the exact same rationale exists for remand. So then under the third factor... In other words, on the second factor, the risks that the denial of relief in this case will produce injustice in other cases. We also should be considering the need to have a deterrent effect on prosecutors or other attorneys who engage in ex parte conversations with judges. Or is that a factor that would be limited to considering a deterrent effect on judges alone? Your Honor, courts that have addressed circumstances in which these types of communications have happened between a litigant and the judge have determined that the incentive goes to both the judge and the litigants. And I'm thinking of the D.C. Circuit's decision in Ray Almsherry from this year, in which a judge was communicating with one of the litigants during the process of the trial. And the court determined that in the second factor, remanding would serve as an incentive to both the judge as well as the litigants. And so to here, where some of the litigants were the exact same individuals involved with the ex parte communications. And is the analysis Mr. Kasner, a deterrence as to a specific deterrence question or a general deterrence question? So in other words, deterrence as to the players involved in this case or deterrence as to judges and lawyers in general? Courts have always treated it as a general deterrence question. In United States v. Smith, for instance, this court talked about the need generally for courts and judges to examine the basis for disqualification. But the specific facts here and the specific individuals involved mean that there's also a specific deterrence question there on top of that. With my brief time remaining, I'd just like to turn to sentencing here. The government has already conceded that Mr. Williams was improperly sentenced to a career offender guidelines range. And this ultimately because the two predicate offenses under which he was charged, one of them precededly was not a predicate and we disagree as to the other. What this means is that the 210 to 240 month enhanced guidelines range used as a starting and anchoring point at sentencing was improper. So the only question is whether or not this is one of the rare cases under the Supreme Court's guidance in Molina-Martinez and Pew that doesn't merit remand when there is a fundamental guidelines range miscalculation. And the transcript from the sentencing hearing demonstrates that that incorrect sentencing range of 210 to 240 months had precisely that anchoring effect. The judge began their consideration with that range in mind. She then also articulated the non-enhanced range of 120 to 151 months. And as she notes at record 64, at page 24, I'm attempting to sentence him to quote, in the middle of those two ranges. And so as a result, that 210 to 240 month range presented her a false choice. She thought that she could sentence him to that or to the non-enhanced range and so in her discretion, she picked something in the middle. And as a result this pulled his range upward and meant that should this court remand there would be a reasonable probability that he wouldn't receive the same sentence on remand. Why wouldn't the judge's statement that she would have, after giving a very thorough 3553 analysis with respect to Mr. Williams, her statement stated that even if she were wrong on the career offender enhancement and guideline calculation, that she would have imposed the same sentence. Why doesn't that save this sentence? Two responses, Your Honor. First, as this court noted in United States v. Johns, the mere fact that a judge says that she would have sentenced him to the same range in her 3553 is not dispositive. But Johns was different. There was not the thorough analysis that the court went through here. I think you would agree with that. I agree with that, Your Honor, but for the purpose of the conclusory statement at the end. But for the 3553 analysis that the judge actually engaged in, the examination of his risk of recidivism and his criminal history relied upon the fact that he had career offender predicates in his background. In the discussion of his criminal history, she notes, you have two serious offenses and I note that because they are career offender predicates. And so while a judge is entitled to sentence a defendant under 3553 in their discretion, they must do so independent of the career offender designation. Otherwise, it's tied to that error. And so because you have that type of tying and intertwinement in this case, particularly here where the judge thought she was sentencing him two and a half years below guidelines range, when in fact she was sentencing him two and a half years above guidelines range, the effect of that is ultimately that a remand would not be a merely pointless step, as the government notes. And I'll reserve the remainder of my time. I do have, forgive me, but I do have a question. Given that the government concedes that the sexual assault charge didn't qualify for career offender status, is there any need for this court to consider whether the controlled substance offense qualified? In other words, would deciding that issue be necessary to the outcome here? Your Honor, it doesn't change the ultimate characterization of him as not a career offender. It may go to whether or not this would be a pointless step. If in fact neither of his predicate offenses were in fact predicates, then it is perhaps even more reasonably probable that a remand in light of these changes to the designations of those offenses would produce a different sentence. We will grant you some brief rebuttal time. Thank you, Your Honor. Thank you, Mr. Kasner. We'll now hear from Mr. Walters. Good morning, Your Honor, and may it please the court. Greg Walters on behalf of the United States. As I expect, as my friend did, to spend most of my time on the judicial recusal issue, I would like to make some brief points about sentencing in case I don't get there with enough time. It's interesting. Judge Darrow did say these were serious offenses. They were career offender predicates. The reason that they're not is not because they're not serious offenses or really violent offenses. It's because we are under this very technical, categorical approach which takes something of what is a serious offense such as aggravated criminal sexual assault, and it's now not because it doesn't necessarily involve the use of force or a drug trafficking offense that arguably hypothetically is not because of perhaps an illusory type of isomer, a positional isomer in defining cocaine by the state of Illinois. He trafficked drugs. He sexually assaulted someone. Those are serious offenses. And so we have this judge doing precisely, Chief Judge Darrow, what this court has instructed judges to do which is when the levels matter or don't matter, make that clear on the record. And what we have is a thorough explanation over nine pages of this transcript of going through a thorough explanation of the 3553A factors and then saying... Mr. Walters, she did indicate at least twice that she was influenced by Williams' career offender status. She said that she was taking I believe she said a deeper dive because of career offender status and that she was fashioning the sentence for specific deterrence because of a career offender status. In light of those statements, how can we say that this conceded error in designating him a career offender is harmless? I'm sorry, Judge Rovner. I heard your question, but I don't see you. I think the, again... You're very lucky. Again, he's not a career offender as a matter of technicality. I mean, we agree with that. As a matter of status, he is not. But, I think a judge, especially in today's day and age when in this difficulty of applying the categorical approach that all of a sudden we get to the Court of Appeals and he's not a career offender in some cases because of a very difficult categorical approach argument. I think it's clear that she didn't just rely on, quote, his status, but the crimes that underlie that status, which were the criminal sexual assault and a drug trafficking crime and then taking into account and whether technically crimes of violence or drug trafficking crimes then taking into account the other 3553A factors and coming to a very thorough explanation of her sentence and saying I would impose the same sentence even if you were not a career offender. So it's not the status, per se, driving it. It is the defendant and his characteristics. And that is not contrary to what my friend said. That's just not a last minute afterthought by the judge after a thorough explanation. In preparing for the argument, and rhetorical argument is often the worst one, but I was sitting here asking myself, how would this court frame a remand in instruction to Judge Darrell as to what she did wrong? The Supreme Court has said the guidelines are the starting point. It has to be according to the Supreme Court. But if you miscalculate but then still give a thorough explanation and say I would impose the same sentence and the alternative range is too low the range I calculate is too high and here is where I'm going to end up. Somewhere in the middle, by the way, is what she said on page 24 of the transcript. Not choosing something exactly in the middle as if she's splitting the baby. So I'd like to turn... You know, we have already held that conclusion that she would impose the same sentence even if there's a guidelines error, aren't enough to demonstrate that any guidelines error was harmless. I mean, we have cases like United States v. Johns making a mistake on the career offender guidelines can have an enormous effect on the guidelines range. As can any guideline calculation error, Your Honor. But to say that this was When should have she said it or how should she have said it to have done it better, I suggest to you that she did it precisely as this Court has instructed on many times to anchor your decision in the 3553A factors and make it clear that you would have imposed the same sentence. And I think she did that. And so that's my answer, Judge Roedner. With respectful disagreement to your characterization that this was just a conclusory statement by a judge after explaining that she felt duty-bound to impose the sentence based on the 3553A. Forgive me, and I will respectfully disagree with you, but was that where she actually said twice that she was influenced by William's career offender status? I think you should go on. Thank you, Your Honor. So we turn to the recusal issue. I don't plan to spend much time on the due process issue since my friend didn't dwell there, but instead on the appearance issue. And as we conceded, there is an appearance  that appears the judge's conduct or the appearance may have waned, and so we have conceded. But this is not a one-size-fits-all where Atwood controls. We look at the circumstances of this case in applying the Liljeburg factors. And so when we do that, it is important that this was a jury trial. Not only is it important that it was a jury trial, but even in the context of the pre-trial rulings and the trial rulings, to see what type of rulings the judge made. What was he asked to rule upon to see that if, and we agree, he does not have to demonstrate actual bias to get past the first Liljeburg factor. That would make no sense. But you at least need to point to the record to say where is there an indication of, where is there an appearance of potential bias in these rulings. And when we have three pre-trial motions, two are mooted, the other one the judge had to grant because they did not identify an alibi witness, and then we look at all of these alleged largely discretionary rulings, objection... I'm sorry, I coughed. Oh, okay. About relevance, leading, argumentative, and we see that this is going, rulings are going for the defendant, against the defendant, for the government, against the government, on very basic objections. And what the defendant is arguing, well this is largely discretionary, it's just, sure there's going to be discretionary trial, but how did the judge exercise in this particular trial? And let me give you an example of where discretionary ruling could have much more impact. Let's take a Daubert hearing, where the judge has determined should this expert testify or not? And it's a close call, and he were to exercise his discretion in one way versus another that could very well be affirmed on appeal. But then if you take into account where there's appearance of bias overall for this trial, is there a potential that that appeared to be an indication of bias within the context of that particular trial? Mr. Walters, how should we analyze the fact that the paralegal involved in this case, and it appears that she was at trial most of the time, that she is one of the individuals who Judge Bruce had a close friendship with and had quite regular communications with during the time in question? He did, and it's because of those communications, largely, that we have said there is an appearance. So how should that impact our analysis of the factors? We don't believe that it should in this case, particularly given that that was not, there were inappropriate emails in the sense that they were ex parte, largely scheduling, but there was no inappropriate relationship, as the counsel found, and we have, and judges are allowed to have friends, it's just it was poor judgment but not bias, or even... But as you said they don't have to show actual bias. No, but even so what's the indication of bias towards the government still, even though Ms. Clare participated as a paralegal she's not even advocating for the government in this case. Do we know the details of that? Was she in the courtroom, out of the courtroom? I have to experience in having a paralegal that I say, would you put up Exhibit 1, and they're clicking the computer, putting up Exhibit 1. Largely doing it for both parties. Oftentimes a defendant doesn't have a paralegal, and so we often do that for both parties. So I ultimately, Your Honor, I don't think it should impact the risk of injustice to Mr. Williams. I think the analysis is exactly the same. Look at the judge's discretionary rulings in this particular case, and where is there an indication of bias when continuances were given? Motions eliminated were inconsequential. Objections were very rote or basic. Jury instructions, no objections. In fact an instruction request on behalf of the defendant that the judge said, yes, I agree with that and I will modify it. And then lastly in closing, only one objection which was overruled and inconsequential. So the risk of injustice to the defendant is low. Whereas in retrial, where we have a sentencing judge who said this is the worst nightmare for these victims to have to come back in and re-experience this. Admittedly, we have cooperating defendants that we will need to bring back in who have received their consideration also. We've dealt with that before, but it's not the cost we're dealing with, but just the cost in general. If we're looking at the public, and which we do under the Lilyberg factors, the cost to the public here of a retrial, when the public in understanding observer who is informed of all the facts, the public will know that this was a jury trial. That there was a buffer here between this appearance of bias and the verdict. And so that factor as well we think is in our favor. And then the second factor, I don't know if I can give you an example of where Do you think that this situation gives members of the public a feeling of respect for the judiciary, for the federal judiciary, and for what occurs during a trial of this sort? Do you think that My understanding is that there was wide knowledge that this behavior had existed in the press. Well, it was certainly well published. I'm sorry I did not catch all of your questions. Is there a risk of deprecating the respect of the judiciary as a result of this conduct? I think that's the case in any 455A violation where there's an appearance of So the question is, is 455A a structural error? Clearly not, because Lilleberg wouldn't have had three factors to evaluate. So the answer can't be that any time there's a 455A violation there has to be a remand. There has to be a weighing of those factors in the context of that particular case that is before the court. Would the, again the fact that the paralegal who he had a lot of these communications with, was the paralegal for this case be relevant to that factor? To the public one? I think, again, this is, I think we need to be looking at a reasonable observer who is informed of all the facts to understand that a paralegal is not an advocate, that is not swaying. It borders I don't mean this in a disrespectful way I think it almost borders on the absurdity to think that the judge would have granted or denied an objection on the ground of relevance because Ms. Clare was in the courtroom presenting the exhibits. And if that were explained, again, to a reasonable observer who was informed of all the facts, understanding the role of a paralegal, I think then they would be, as a member of the public, be able to have confidence that that appearance isn't. You're linking her involvement in the case against the substantive rulings of the court for the purpose of undermining the public's confidence. Is that something that we need to look at? Does it need to be linked to the substantive rulings or is there a concern about undermining the public confidence because of her communications with him, because of their friendship, and because she was involved in this case separate and apart from any substantive rulings? Former U.S. Attorney Dan Webb appeared before district judges all the time who he was dear friends with as a former as a colleague. But was he having email communications and phone communications with them about cases going on in the office? That's the distinctive factor here. I'm not saying just the friendship being there. I'm over my time. I think we really need to look at Ms. Clare's communications and I am not defending her. These are unprofessional and ultimately there was an adult in the room who was the judge that wore a robe and that didn't quite work out. But a lot of these deal with scheduling. And it was friendly. I think it's embarrassing. I'm guessing if Ms. Clare were standing here she would tell you that she too is embarrassed, that she communicated in that way with someone who is a dear friend, was a dear friend, but it looked unprofessional. But they were largely scheduling emails between those two and gossip, things that friends do. I must tell you for me it looked a lot more than unprofessional. At times it looked like there was a real bias in favor I'm talking about globally now, a real bias in favor of the government. That is something that should never occur. You will have no argument from me that it should never occur. But we have a handful that are potentially merits related emails. Four email strings post-judgment regarding appeals. I'm not defending the content. And the other one in Nixon itself which I think in reading the Nixon email, Judge Rovner is again completely unprofessional, poor judgment. I have a lot of adjectives I guess the government could use for it. But it is equally critical of my colleague Ellie Pearson as well as Ms. Nixon and then also in talking about another colleague of mine and the judge's view from his experience I guess as a prosecutor as to what a good cross-examination would be. At this point, how many of the cases have been ordered to be retried? No cases have been ordered to be retried. I think there are five or six motions pending and they have not yet been ruled upon. Before the district court, correct? Right. I see that I'm well beyond my time and I apologize. Judge Rovner, did you have any other questions of Mr. Walters? No, but thank you very much, Mr. Walters. You're welcome, Your Honor. It's good to see you. You can't see me! We've kept Mr. Walters over. I'm going to grant Mr. Kasner three minutes for rebuttal so you may reproach. Your Honor, turning first to the question of judicial recusal and bias in this case, there are two totems in this case that stand out as ways of measuring what to do here. First, we have the Judicial Council Order and second, we have Atwood. The Judicial Council Order examined the totality of the ex parte communications and its remedy is instructive. There, it ordered that for a total of a year period, Judge Bruce could not preside in any criminal case involving the U.S. Attorney's Office. That included trials and sentencing hearings alike and it involved cases even when guardrails had been constructed against this type of behavior happening in the future. And the Judicial Council did that because it found it So the question is whether or not, given that benchmark, a case that immediately preceded disclosure that involves some of the same personnel involved in the ex parte communications and where the guardrails weren't in place requires a remedy as well when, as the government admits, there has been a 455A violation. But you would agree, I think, that the standard that Judicial Council applied is different  It was ordering a prophylactic remedy moving forward. But it is instructive to the fact that it thought necessary to aid public confidence that these dramatic steps need to be taken. Steps that it admitted were burdensome to the public and to the judiciary and to the litigants. And second, we have Atwood. And Atwood is instructive here for a number of reasons. It held that even in a case where there was no tie between that case and the communications that a remand was required. Further, there was no allegation in Atwood that there was any impropriety. It was an inherently discretionary proceeding but the judge sentenced the defendant to the middle of the guidelines range. There was no allegation beyond the form that it was a sentencing hearing that it was inherently discretionary. And Atwood's analysis of that hearing rests on the fact that the proceeding was, by its nature, discretionary. As Mr. Williams has pointed out in his briefing, courts that have examined trials and how they've been affected by 455A, including the Fifth Circuit and Higginbotham and Continental, and the Second Circuit and Amico, have held that the discretionary nature of a trial is similar. And under Lilleberg Factor I, remand is pointed in favor of. Finally, just to turn briefly to the sentencing question. Again, the government has admitted that there is a violation insofar as Mr. Williams was sentenced under an incorrect career offender guidelines range. The Supreme Court has made clear that in most all cases, such a guidelines range calculation requires remand. This is not the rare case to the contrary. And the evidence in the transcript demonstrates that even despite the sentencing judge's proclamation that she was attempting to sentence him under the 3553 factors in her discretion, she was undoubtedly anchored by that 210-240 months range, both in choosing her ultimate selection of the sentence and in her analysis of his criminal history. And so as a result, she ended up, instead of a two and a half year below guideline sentence, with a two and a half year above guideline sentence. This court should remand for either a new trial or at minimum for resentencing. Thank you, Your Honors. Thank you very much, Mr. Kazarin. You have the great thanks of the court for your work as appointed counsel in this case. Thank you to you and your team. Thank you, Mr. Walters. And the case will be taken under advisement.